# In the United States Court of Federal Claims

No. 23-418C

(Filed: July 7, 2025)

| | |
|---|---|
| **TERRENCE R. WINSTON,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

*Wojciech Z. Kornacki*, Pentagon Law Office, Washington, D.C., for Plaintiff.

*Joseph Alan Pixley*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. On the briefs were *Miles Jarrad Wright*, Trial Attorney, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Steven J. Gillingham*, Assistant Director. Of counsel was *Capt. Andrei Kouzema*, General Litigation Division, Office of the Judge Advocate General, Department of the Navy.

## OPINION AND ORDER

***SOLOMSON*, Chief Judge.**

Plaintiff, Terrence R. Winston, requested a transfer to the Navy's Fleet Reserve. The Navy granted his request. Recognizing that the transfer may have caused him pecuniary harm — in the form of a lost promotion and higher retirement pay — Mr. Winston sought to cancel his request to transfer to the Fleet Reserve. The Navy denied his cancellation request. Mr. Winston sought relief from the Board for Correction of Naval Records ("BCNR"), but it similarly denied his request. Not once, but thrice. He now challenges the Navy's decision rejecting his transfer cancellation request. But the Navy has wide discretion in deciding whether to grant a request to transfer to the Fleet Reserve, or, relatedly, to cancel such a request. And the bottom line is that Mr. Winston did not remotely carry his burden to demonstrate that the Navy abused its discretion in his case. Moreover, Mr. Winston's request to transfer to the Fleet Reserve was voluntary — a factual finding that defeats his claim for back pay (and any other associated monetary benefits).

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  Mr. Winston's Navy Service

Mr. Winston served in the Navy for more than three decades, including 20+ years of active service.  AR 206.  Mr. Winston's naval career began on August 31, 1984, when he enlisted in the Navy Reserve.  AR 351.  In 1988, he was released from active duty to reserve duty.  AR 350.  On October 1, 2001, Mr. Winston reenlisted in the Navy Reserve. AR 649.  At the time of his official reenlistment in 2001, Mr. Winston was designated a Master-at-Arms Petty Officer 2nd Class.  *Id*.  On September 16, 2013, he was promoted to grade E-7, Master-at-Arms Chief Petty Officer.  AR 605.  On March 27, 2014, Mr. Winston once again reenlisted for active duty for a period of three years, until March 27, 2017. AR 588.  On February 15, 2015, the Navy deployed Mr. Winston to Bahrain.  AR 603.

Upon reporting to Bahrain, Mr. Winston was assigned the duties of Security Section Chief of the Naval Security Force, Department of Defense Dependents ("DoDD") Schools Security Liaison, and Command Suicide Prevention Coordinator.  AR 132, 173. At some point in 2015, Mr. Winston requested a transfer to the Fleet Reserve.  *See* Section D, *infra*.  On January 25, 2017, Mr. Winston received his "Official Fleet Reserve Orders," noting March 31, 2017, as the effective date of his transfer to the Fleet Reserve.  AR 148–51.  On February 14, 2017, the Navy discharged Mr. Winston, which he acknowledged by signing his "Certificate of Release or discharge From Active Duty."  AR 60, 152.

### B.  Mr. Winston's Performance Reviews

During his service, Mr. Winston received many positive performance reviews, *e.g.*, AR 159–60, 171–72, 281–83, 575–76, including one on January 12, 2015, where he was called a "standout performer."  AR 160.  Additionally, he received many awards and decorations.  AR 153, 164, 165.  On April 30, 2015, however — while serving in Bahrain — Mr. Winston received a negative performance counseling from his supervisor, Senior Chief Master-at-Arms ("MACS") Michael Minotto.  AR 137.  The counseling record

---

[1] This background section constitutes the Court's findings of fact drawn from the administrative record.  Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), covering judgment on the administrative record, "is properly understood as intending to provide for an expedited trial on the record" and requires the Court to "make factual findings from the record evidence as if it were conducting a trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005).  Citations to the administrative record, *see* ECF No. 22, are denoted as "AR" followed by the page number.

documents that Mr. Winston's "lack of attention to detail and follow-up [led] to a systemic breakdown within [the] Division." *Id.* Further, MACS Minotto wrote that Mr. Winston's behavior "results in a disproportionate responsibility and authority with [the] juniors" and that if he "continue[s] to fail [his Chain of Command] and Sailors [he] will be resigned [*sic*] a position in Security that fits [his] level of leadership ability." AR 137, 140. Mr. Winston signed the counseling form and responded with the following comment: "I was not clear in direction and asked for assistan[ce] yesterday." AR 140.

On May 28, 2015, an incident led to Mr. Winston's receiving a second negative performance counseling. AR 26, 120, 138. A parent attempting to enter a Department of Defense Education Activity ("DoDEA") School was detained in front of his children. AR 26. According to a preliminary inquiry into the incident, there was an original order on May 27, 2015, to detain the parent if he attempted to access the DoDEA campus. *See* AR 121. Later that same day, however, the order was rescinded because the situation was "all clear." *Id.* On the morning of May 28, 2015, Mr. Winston was advised that the detention order was no longer in effect, and that Mr. Winston "should follow up on that." AR 122. Nevertheless, when the parent in question attempted to enter the DoDEA campus, Navy security personnel mistakenly detained him in front of his children. *Id.* Approximately fifteen minutes after the parent's detention, Mr. Winston arrived at the gate, confirmed that the order was no longer in effect, and released the detained individual. AR 123.

In response to that May 28, 2015, incident, Chief Master-at-Arms ("MAC") Larry Thomas issued Mr. Winston a counseling note, explaining that Mr. Winston "is not informing the Chain of Command in a timely manner of events taking place on [DoDD school] grounds, [and] not passing on pertinent information to his Sailors[.]" AR 138. MAC Thomas further determined that "[t]his lack of leadership and attention of detail . . . could have resulted in injury to any of the Sailors . . . and has caused a loss of confidence in [Mr. Winston's] abilities to properly carry out his duties as Chief Petty Officer." *Id.* After that incident, the Navy planned to reassign Mr. Winston within his department. AR 139. Mr. Winston refused to sign the negative counseling report or make a statement in response to it. *Id.*

### C. Mr. Winston's Complaints About His Commanding Officer

Mr. Winston alleges that after he arrived in Bahrain, his supervisor, MACS Minotto, subjected Mr. Winston to "harassment, abusive verbal comments, threats, and

excessive criticisms." ECF No. 24 at 11.[2] To substantiate these claims, Mr. Winston points to treatment that he claims demonstrate MACS Minotto's abusive behavior, including the allegation that MACS Minotto prevented him from attending a mandatory orientation brief, "altering his work schedule so [Mr. Winston] had to work more hours, and failing to keep him properly informed." *Id*. at 11–12.[3]

Mr. Winston further claims that MACS Minotto's "toxic leadership was widely known in the unit" and points to the declarations of several of his Navy colleagues to substantiate that claim. AR 834, 1235, 1237.

### D. Mr. Winston's Transfer to the Fleet Reserve

At some point in 2015, Mr. Winston requested a transfer to the Fleet Reserve.[4] AR 27, 143. The AR does not contain the date of Mr. Winston's request. ECF No. 27 at 14 n.5 (the government noting that "[t]he administrative record does not contain Mr. Winston's original request to transfer to the Fleet Reserve because he did not include it with his application to the BCNR"). At oral argument, the Court pressed the parties to identify the date of Mr. Winston's transfer request, but neither party could do so. ECF No. 32 at 8:9 – 9:13.

On or about September 16, 2015, Mr. Winston was reassigned to a different unit as the Supply Lead Chief Petty Officer. AR 171, 603, 692.

---

[2] Citations to specific page numbers within electronic filings are to the ECF-stamped page numbers in the header of the filed PDF.

[3] Here, and in numerous other instances, instead of citing to the AR to validate these claims, Mr. Winston cites to his very own complaint, ECF No. 23. ECF No. 24 at 12. As counsel should know, the plaintiff at this stage in the proceedings must prove his claims with the AR. RCFC 52.1(c)(1) ("[A] party . . . must include in its motion or supporting memorandum a statement of facts that draws upon and cites to the portions of the administrative record that bear on the issues presented to the court."); *see also Bannum*, 404 F.3d at 1354 (RCFC Rule 52.1, covering judgment on the administrative record, "is properly understood as intending to provide for an expedited trial on the record" and requires the Court to "make factual findings from the record evidence as if it were conducting a trial on the record").

[4] An enlisted member of the Regular Navy or the Navy Reserve may request to be transferred to the Fleet Reserve after completing a minimum of 20 years in active duty. 10 U.S.C § 8330(b). Members of the Fleet Reserve can be called into active duty in a time of war or national emergency. Navy Military Personnel Manual ("MILPERSMAN") 1830–40.

Almost three months later, on December 9, 2015, Mr. Winston requested to cancel his transfer to the Fleet Reserve. AR 143. The reason for his submission was: "I will not reach [high year tenure] until April 2021." AR 143. The Navy denied his request, although the AR does not document the date of the denial. ECF No. 27 at 15.

On March 24, 2016, Mr. Winston sent a memorandum to his commanding officer regarding his request to cancel his transfer to the Fleet Reserve. AR 145. Mr. Winston noted that the Navy denied his original request to cancel his transfer "due to 'No justification provided . . . ,'" and that he thus was resubmitting a revised transfer cancellation request "with justification." *Id*. The administrative record contains neither the revised cancellation request, nor the Navy's purported justification for the denial of either request. ECF No. 27 at 15 n. 8 (government noting that "[t]he administrative record does not contain Mr. Winston's second request to cancel his transfer to the Fleet Reserve").

On August 4, 2016, the Navy notified Mr. Winston that his transfer to the Fleet Reserve had been approved. AR 204–05. On January 25, 2017, Mr. Winston received his official Fleet Reserve orders, listing March 31, 2017, as the effective date. AR 148–51. On February 14, 2017, Mr. Winston signed a form confirming his release from active duty. AR 152.

### E. Mr. Winston's First Application to the BCNR

More than five years after leaving active duty, on October 20, 2020, Mr. Winston submitted his first Application for Correction of Military Record to the BCNR. AR 134. In his application, Mr. Winston requested "to be advance[d] to Senior Chief Petty Officer (E8) and [to receive] backpay as of 2017," or to "be advance[d] to that paygrade with no backpay, but retired as an E8." *Id*. In support of his request, Mr. Winston argued that he and a "white supervisor had a dispute months before," and that, as a result, Mr. Winston "faced professional retaliation," including "mainly a lost job opportunity." AR 134. Mr. Winston further complained that his request to cancel his transfer to Fleet Reserve should not have been denied, in part because he "was not at [his] High Year Tenure." *Id*.

On September 24, 2021, the BCNR denied Mr. Winston's application, because the evidence he submitted was "insufficient to establish the existence of probable material error or injustice." AR 226. The BCNR further determined that the counseling entries "are valid[,] . . . are not considered adverse actions, and did not result in punitive action

or an adverse fitness report." AR 227. Accordingly, the BCNR found "no evidence of racial bias or retaliation" associated with these counseling reports. *Id*. Regarding Mr. Winston's request to cancel his transfer to Fleet Reserve, the BCNR determined that, pursuant to MILPERSMAN 1830–040, "once [his] request for retirement was submitted and processed, [Navy Personnel Command] was not obligated to grant [his] request to rescind [his] retirement." *Id*.[5]

## F. The Second BCNR Decision

On February 1, 2022, Mr. Winston sought reconsideration of the 2021 BCNR decision "based on new and outcome altering evidence." AR 8. The new evidence included a memorandum from another Master-at-Arms who served with Mr. Winston in Bahrain, and supported Mr. Winston's claim "that [MACS Minotto] created a hostile work environment[.]" AR 5.

On June 17, 2022, the BCNR issued its second decision, once again concluding that Mr. Winston's claims were unfounded. AR 1 (BCNR concluding that Mr. Winston's new evidence was "insufficient to establish the existence of probable material error or injustice"). In particular, the BCNR found that his "new evidence was insufficient to substantiate [his] allegations of harassment, discrimination, or a hostile work environment." AR 2. The BCNR also explained that the Navy was not obligated to cancel Mr. Winston's request to transfer to the Fleet Reserve because there was "no evidence that [he] was selected for advancement to E-8 when [he] withdrew [his] transfer to the Fleet Reserve" and "[t]herefore, the [Navy Personnel Command] was under no obligation to consider [high year tenure] as a valid basis to grant [his] request to withdraw [his] transfer to Fleet Reserve." AR 3.

## G. Mr. Winston's Complaint Before this Court

On March 27, 2023, Mr. Winston filed his first complaint in this Court, challenging the BCNR's decisions and the Navy's refusal to cancel his request to transfer to the Fleet Reserve. ECF No. 1. The complaint alleged that Mr. Winston was involuntarily

---

[5] MILPERSMAN is issued pursuant to authority granted in the U.S. Department of Navy, U.S. Navy Regulations, 1990, art. 0105 (Sept. 14, 1990). MILPERSMAN 1830–040 is the Navy regulation which governs transferring to the Fleet Reserve and the release from active duty after 20 years of active service. *See* 10 U.S.C § 8330(b); MILPERSMAN 1830–40.

discharged from active duty because he only requested to transfer to the Fleet Reserve due to his "supervisor's abusive tactics, his chain of command's failure to take corrective actions, and the denial to allow Mr. Winston to transfer to another unit[.]"  *Id*. at ¶ 113. Mr. Winston further alleged that the Navy's refusal to grant his request to cancel his transfer to the Fleet Reserve constituted a violation of "MILPERSMAN 1830–040 [which] states that requests for cancellation of a fleet reserve transfer may be granted on a case-by-case basis only."  *Id*. at ¶ 116.  Finally, Mr. Winston alleged that the BCNR's second decision was arbitrary and capricious.  *Id*. at ¶¶ 124–32.

On October 19, 2023, Mr. Winston filed an unopposed motion to remand this case to the BCNR in light of new evidence: an "opinion from a certified forensic document examiner stating that the signature attributed to a signatory" on one of Mr. Winston's counseling statements "was not authentic."  ECF No. 12 at 2.  On November 2, 2023, this Court granted that motion, remanding the case back to the BCNR for yet further consideration.  ECF No. 14.

### H. The Third BCNR Decision

On April 8, 2024, the BCNR once again denied Mr. Winston's application, concluding that "the Board continued to find insufficient evidence of any probable material error or injustice warranting relief."  AR 689.  In a comprehensive, 13-page decision, the BCNR noted that it found some of Mr. Winston's "complaints about [Mr. Winston's] supervisor to be so frivolous that they actually tended to confirm his impressions of [Mr. Winston's] performance and abilities as a Chief Petty Officer . . . ." AR 696.  Further, the BCNR concluded that if Mr. Winston was facing discrimination, he should have availed himself of mechanisms within the Navy to report and investigate such discrimination in a timely manner.  *Id*.  His "failure to avail [himself] of these mechanisms, despite [his] many years of experience in the Navy, presumed familiarity with these mechanisms, and the advice of the Navy Judge Advocate . . . raised serious doubts regarding [his] claims in this regard first made years after the fact."  *Id*.

The BCNR found that the evidence Mr. Winston submitted, including statements from other personnel that he served with in Bahrain and a statement from his spouse, were "non-objective statements" that fell "far short of [Mr. Winston's] burden to establish that [he] was subjected to a toxic and hostile work environment."  AR 697.  The BCNR "found no credibility, or even relevance" to the claim that the signature on one of Mr. Winston's counseling statements was inauthentic.  AR 698.

Finally, the BCNR "found no merit to [Mr. Winston's] contention that [he] was involuntarily transferred to the Fleet Reserve." AR 699. The Board explained that Mr. Winston "voluntarily requested such a transfer, and [his] request was approved[,]" and even if Mr. Winston was exposed to a hostile work environment, his request would still not have been deemed to be involuntary because there remained "numerous other options available to [him] to address this situation other than requesting retirement." *Id.* The Board concluded that, pursuant to MILPERSMAN 1830–040, "cancellation of a Fleet Reserve transfer authorization will be granted *on a case-by-case basis only*" and that the "requests that are normally approved" are limited to criteria that Mr. Winston did not satisfy.[6] AR 700 (emphasis in original).

### I.  Mr. Winston Returns to the Court of Federal Claims

On July 30, 2024, following the BCNR's third decision in this case, Mr. Winston filed an amended complaint in this Court. ECF No. 23 ("Am. Compl."). Mr. Winston's amended complaint repeats the three primary allegations from his first complaint, including: (1) that he was involuntarily discharged, Am. Compl. at ¶¶ 89–102; (2) that the Navy violated MILPERSMAN 1830–040, *id.* at ¶¶ 103–11; and (3) that the 2022 BCNR decision was arbitrary and capricious, *id.* at ¶¶ 112–18. He additionally alleges that the 2024 BCNR decision was arbitrary and capricious. *Id.* at ¶¶ 119–24.

On July 30, 2024, Mr. Winston filed a motion for judgment on the administrative record ("MJAR"). ECF No. 24 ("Pl. MJAR"). On September 13, 2024, the government filed its motion to dismiss the amended complaint, or in the alternative, a cross-MJAR. ECF No. 27 ("Def. MJAR"). Mr. Winston filed his response and reply on October 11, 2024, ECF No. 28 ("Pl. Resp."), and the government filed its reply on November 13, 2024, ECF No. 29 ("Def. Rep."). On February 25, 2025, the Court heard oral argument in these proceedings. ECF No. 32 ("Tr.").

---

[6] The BCNR relied on the 2024 version of the MILPERSMAN. *See infra* note 29.

## II.    JURISDICTION

"The Tucker Act grants jurisdiction to the [United States Court of Federal Claims] over certain actions for monetary relief against the United States." *Mote v. United States*, 110 F.4th 1345, 1352 (Fed. Cir. 2024) (citing 28 U.S.C. § 1491).  In particular, the Tucker Act provides that this Court:

> shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).  But the "Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part) (first citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983), and then *United States v. Testan*, 424 U.S. 392, 398 (1976)).  In the parlance of Tucker Act cases, that source must be "money-mandating." *Id.; see also Boeing Co. v. United States*, 119 F.4th 17, 21 (Fed. Cir. 2024) ("Pursuant to § 1491(a)(1) of the Tucker Act, the Court of Federal Claims also has jurisdiction to entertain monetary claims against the United States based on contracts with the United States, the Constitution, or other money mandating statutes or regulation. 28 U.S.C. § 1491(a)(1).").

In evaluating whether a plaintiff has stated a money-mandating claim within this Court's Tucker Act jurisdiction, our appellate court — the United States Court of Appeals for the Federal Circuit — has instructed us to proceed as follows:

> When a complaint is filed alleging a Tucker Act claim based on a Constitutional provision, statute, or regulation, *see* 28 U.S.C. § 1491(a)(1), the trial court at the outset shall determine, either in response to a motion by the Government or *sua sponte* (the court is always responsible for its own jurisdiction), whether the Constitutional provision, statute, or regulation is one that is money-mandating.

> If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare that it has jurisdiction over the cause, and shall then proceed with the case in the normal course. For purposes of the case before the trial court, the determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action.

*Fisher*, 402 F.3d at 1173.

A statute or regulation is money-mandating where it "can fairly be interpreted as mandating compensation by the Federal Government . . . ." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (quoting *Mitchell*, 463 U.S. at 217). For jurisdictional purposes, it is sufficient "that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages." *Id.* at 473. In addition, the statute and regulations must be money-mandating as to the class of which plaintiff claims to be a member. *Casa de Cambio Comdiv S.A. de C.V. v. United States*, 291 F.3d 1356, 1361 (Fed. Cir. 2002) (holding that, even if "[the regulations] were money-mandating as to [a third party]," they "are not money-mandating as to [plaintiff] since there is no indication that they were designed to convey rights on [members of plaintiff's class]").

Here, Mr. Winston's amended complaint, *see* Am. Compl. ¶ 10, invokes the Military Pay Act, 37 U.S.C. § 204, which provides that "a member of a uniformed service who is on active duty" is "entitled to the basic pay of the pay grade to which assigned[.]" That provision has been held to be a money-mandating statute sufficient to confer jurisdiction upon this Court. *Smith v. Sec'y of Army*, 384 F.3d 1288, 1294 (Fed. Cir. 2004) ("It is well established that the Military Pay Act is a money-mandating statute."). Our appellate court, the United States Court of Appeals for the Federal Circuit, long ago held that 37 U.S.C. § 204 "serves as the money-mandating statute applicable to military personnel claiming damages and ancillary relief for wrongful discharge." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997); *see also James v. Caldera*, 159 F.3d 573, 581 (Fed. Cir. 1998) ("If an enlisted member of the Armed Services is wrongfully discharged before the end of his or her current term of enlistment, the right to pay conferred by § 204

continues and serves as the basis for Tucker Act jurisdiction."); *Adkins v. United States*, 68 F.3d 1317, 1321 (Fed. Cir. 1995) ("If his discharge was involuntary and improper, [plaintiff's] statutory right to pay was not extinguished, and thus serves as a basis for Tucker Act jurisdiction.").

However, when a service member's discharge from the military is voluntary, "his right to pay end[s] upon his discharge[,]" and he "retain[s] no statutory entitlement to compensation and consequently no money-mandating provision would support Tucker Act jurisdiction over his claim." *Tippett v. United States*, 185 F.3d 1250, 1255 (Fed. Cir. 1999). Here, Mr. Winston's non-frivolous allegation of involuntariness suffices to establish jurisdiction for purposes of his MJAR. *See Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006) ("Accordingly, we conclude that the issue of the voluntariness of a plaintiff's discharge is not jurisdictional; rather, is it a question that should be considered in the context of the merits of a plaintiff's case in determining whether a plaintiff can take advantage of § 204's money-mandating status."). As in *Metz*, the question of the voluntariness of Mr. Winston's discharge is a merits issue.

## III.    STANDARD OF REVIEW

Ordinarily, Tucker Act claims — whether of the contract, money-mandating, or illegal exaction varieties — proceed before this Court "on a *de novo* basis." *L & D Servs., Inc. v. United States*, 34 Fed. Cl. 673, 678 n.6 (1996). That is, the Court does not defer to an agency's fact finding or conclusions, but instead receives new evidence, makes its own factual findings, and reaches an independent determination regarding whether a plaintiff has substantiated its claim by a preponderance of the evidence. *See, e.g., Ampersand Chowchilla Biomass, LLC v. United States*, 150 Fed. Cl. 620, 642 (2020) ("The Court reviews claims for tax refunds and [money-mandating statutory] claims . . . on a *de novo* basis."), *aff'd*, 26 F.4th 1306 (Fed. Cir. 2022); *Cherokee Gen. Corp. v. United States*, 150 Fed. Cl. 270, 283 (2020) ("Even where a contracting officer's legal opinion is fully explained (unlike here), it is not binding on the government in judicial proceedings (which are de novo) and it cannot override the language of the contract itself." (citing *Wilner v. United States*, 24 F.3d 1397, 1401–02 (Fed. Cir. 1994))); *Cencast Servs., L.P. v. United States*, 94 Fed. Cl. 425, 453 (2010) ("In general, a tax refund suit is a *de novo* proceeding and any subsidiary factual findings of the IRS are given no weight by the court."), *aff'd*, 729 F.3d 1352 (Fed. Cir. 2013); *Cnty. of Suffolk v. United States*, 19 Cl. Ct. 295, 299 (1990) ("The Claims Court typically considers allegations that a party did not fulfill its obligations under a contract on a *de novo* basis."); *Woog v. United States*, 48 Ct. Cl. 80, 94 (1913) ("The court is of opinion that

the statute under which we are taking jurisdiction requires us to make an independent investigation and to afford relief irrespective of the findings of any board.").[7]

Where Congress wants this Court to apply a more deferential standard of review, Congress has provided such instruction.  The most common example is, of course, the Administrative Procedure Act's ("APA") standard of review, which Congress expressly applied to actions in this Court challenging government procurement decisions pursuant to 28 U.S.C. § 1491(b).  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").[8]

Military pay cases, as noted *supra*, involve money-mandating claims.[9]  In such cases, Congress has neither required this Court to apply the APA's standard of review by express reference to that statute, nor otherwise directly imposed the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" formulation. *See* 5 U.S.C. § 706(2)(A).  Nevertheless, "[a]s Mr. Justice Holmes commented . . . [,] 'a page of history is worth [a] volume of logic.'"  *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 675–76, (1970) (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)).  And

---

[7] *But see Fla. Home Med. Supply, Inc. v. United States*, 131 Fed. Cl. 170, 177–78 (2017) (contrasting a breach of contract case — where "[t]he evidence that plaintiffs may offer is governed by the relevant rules of this court, and is not limited to the information previously provided to [the agency]" — and "[t]he court's review of an agency decision," which "is limited to an administrative record and is conducted under a deferential 'arbitrary, capricious, contrary to law, or unsupported by substantial evidence' standard" (citations omitted)).

[8] Congress has imposed the arbitrary and capricious standard in other instances as well.  *See, e.g.*, 50 U.S.C. § 4215(h)(1) ("A claimant may seek judicial review of a denial of compensation under this section solely in the United States Court of Federal Claims, which shall review the denial upon the administrative record and shall hold unlawful and set aside the denial if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); 42 U.S.C. § 300aa-12(e)(2) (providing that "the United States Court of Federal Claims shall have jurisdiction to undertake a review of the record of [vaccine injury] proceedings and may thereafter . . . set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

[9] *Friedman v. United States*, 158 F. Supp. 364, 376 (Ct. Cl. 1958) ("[T]he sort of 'review' contemplated in an action to recover lost pay in the Court of Claims is an original suit for a money judgment and not a review looking to the alteration or correction of an official military record or to the compelling of official action by an officer of an executive department.  And such 'reviews' by this court to determine whether or not pay has illegally been withheld from a member or former member of the military services, have long been sanctioned by this court and the Supreme Court." (citing cases)).

the history and binding precedent make quite clear that our Court as well as our predecessor and appellate tribunals have consistently applied the arbitrary and capricious standard of review — in cases involving military record correction board decisions — since at least 1954. *See, e.g.*, *Gordon v. United States*, 121 F. Supp. 625, 629 (Ct. Cl. 1954) ("By this application plaintiff invoked the jurisdiction of the Army Board on Correction of Military Records and was bound by the terms thereof unless the resulting action of the board was arbitrary or capricious, etc., or was in violation of some other substantive right."); *Brown v. United States*, 396 F.2d 989, 991 (Ct. Cl. 1968) ("Since Congress has vested the Service Secretaries (acting on the recommendation of the various physical disability and correction boards) with such discretion in determining eligibility for disability-retired pay, we have always adhered to that scope of review." (footnotes omitted)).[10]

The United States Supreme Court has long endorsed this deferential standard of review, although it has never concluded that the APA literally applies to these cases. *See Chappell v. Wallace*, 462 U.S. 296, 303 (1983) (first citing *Grieg v. United States*, 640 F.2d 1261 (Ct. Cl. 1981); and then *Sanders v. United States*, 594 F.2d 804 (Ct. Cl. 1979), and explaining that correction board "decisions are subject to judicial review and can be set aside if they are arbitrary, capricious or not based on substantial evidence").[11] Indeed, Supreme Court precedent supporting the application of the arbitrary and capricious standard of review to military pay cases apparently predates the APA. *See Wales v. United States*, 130 F. Supp. 900, 904 (Ct. Cl. 1955) (holding that arbitrary and capricious standard of review applies to BCMR findings and that "the doors of this court are always open to grant relief to a party aggrieved by the action of an executive or administrative officer which is arbitrary or capricious" because "[t]he Supreme Court has long recognized the right of the court to review such action" (internal citations omitted) (citing *Dismuke v. United States*, 297 U.S. 167, 171–72 (1936))).

---

[10] This is true even where "resort to a correction board is not mandatory." *Lewis v. United States*, 458 F.3d 1372, 1376 (Fed. Cir. 2006) (citing *Martinez v. United States*, 333 F.3d 1295, 1305 (Fed. Cir. 2003), and explaining that "where, as here, a service member has elected to pursue relief before a corrections board, we have reviewed the board's decision to determine whether it is arbitrary, capricious, unsupported by substantial evidence, or contrary to law" (other citations omitted)).

[11] *See also Clinton v. Goldsmith*, 526 U.S. 529, 539 (1999) ("A servicemember claiming something other than monetary relief may challenge a BCMR's decision . . . as final agency action under the [APA] . . . in the district courts" or "[i]n the instances in which a claim for monetary relief may be framed, a servicemember may enter the Court of Federal Claims with a challenge . . . under the Tucker Act, 28 U.S.C. § 1491" (citations omitted)).

Perhaps because the APA does not actually apply by its terms to Tucker Act monetary claims, *see* 28 U.S.C. § 1491(a),[12] binding authority from the Court of Claims "permitted the taking of *de novo* evidence by the [trial court]" in military pay cases. *Beckham v. United States*, 375 F.2d 782, 785 (Ct. Cl. 1967);[13] *see Brown*, 396 F.2d at 991–92 ("We have also, since we first began dealing with disability retirement two decades ago, regularly considered evidence over and above that presented before the administrative boards if a party wishes to offer it. . . . This coupling of the substantial-evidence standard with the acceptance of new evidence has not . . . encroached on the administrative process.").

Notwithstanding that *Beckham* and *Brown* are consistent with the money-mandating nature of military pay claims — and even though Congress never applied the APA to military pay claims in Tucker Act cases — the Federal Circuit, in a split panel decision in *Walls v. United States*, 582 F.3d 1358 (Fed. Cir. 2009), concluded that "it has become well established that judicial review of decisions of military correction boards *is conducted under the APA*." 582 F.3d at 1367 (emphasis added and footnote omitted); *see also Pearl v. United States*, 111 Fed. Cl. 301, 303 n.1 (2013) (noting that "[a]lthough the APA [is] explicitly cited only in the portion of the Tucker Act pursuant to which this court exercises jurisdiction in bid protests, *see* 28 U.S.C. § 1491(b)(4), 'it has become well established that judicial review of decisions of military corrections boards is conducted under the APA' standard of review" (quoting *Walls*, 582 F.3d at 1367)).[14]  The Federal

---

[12] *See Bowen v. Massachusetts*, 487 U.S. 879 (1988); *District of Columbia v. United States*, 67 Fed. Cl. 292, 305 (2005) (contrasting "two waivers of sovereign immunity" — "[t]he first is found in the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), the foundation of this court's jurisdiction, and the second is found in the [APA], 5 U.S.C. §§ 701–706 (2000), which gives United States district courts jurisdiction over certain claims 'seeking relief other than money damages' against the United States, *id.* § 702" (footnote omitted)).

[13] *See Beckham*, 375 F.2d at 785 ("In determining the arbitrariness, capriciousness, or insubstantiality of an administrative decision, it is not necessary that the review always be restricted to the record before the administrative body. . . . This has not prevented the court from applying its substantial evidence test to the findings of the Board.  All that this procedure has done is to expand our substantiality test.  We do not ask if the Board decision is supported by substantial evidence upon an inspection of the record, but instead, we ask if the decision meets the test when compared with all available evidence — that is both the record and the de novo evidence.").

[14] Judge Newman dissented at length in *Walls*.  *See Walls*, 582 F.3d at 1369–81 (Newman, J., dissenting) ("The *Brown* ruling continues to be the law of this circuit." (footnote omitted) (citing *Bray v. United States*, 515 F.2d 1383 (Ct. Cl. 1975), amongst other cases)).  Judge Newman maintained that "[n]o authority disturbs the long-standing rulings that because of the nature of correction board proceedings, augmentation of the administrative record is permissible" and that

Circuit thus applied APA cases and procurement protest decisions to find that our review of military pay claims "is generally limited to the administrative record." *Id.* at 1367–68 (discussing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985), *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009), and *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001)).[15] Judge Wolski's summary of the standard of review, however, is more accurate: "[t]he Court reviews the decision of a Secretary acting through a Correction Board according to a standard *borrowed from* the [APA]." *Brooks v. United States*, 65 Fed. Cl. 135, 140 (2005) (emphasis added and citation omitted).[16]

The upshot of this history is that our Court resolves military pay claims via cross-motions for judgment on the administrative record, pursuant to RCFC 52.1(c). *See* RCFC Appendix K ("Procedure in Military Pay Cases"). That process "is properly understood as intending to provide for an expedited trial on the record" and requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1354, 1356 (applying this standard in a bid protest case); *see*

---

"[t]he APA does not exclude this approach." *Id.* at 1376.

[15] *Walls* relied on two earlier Federal Circuit cases for the proposition that this Court applies the APA in reviewing decisions of military correction boards: *Metz*, 466 F.3d 991, and *Fisher*, 402 F.3d 1167. *See Walls*, 582 F.3d at 1367 n.11. But neither case mentions the APA even a single time. *Metz*, consistent with precedent, simply noted that "the Court of Federal Claims reviews the Board's action under the same standard as any other agency action," while acknowledging that, fundamentally, military pay claims are money-mandating claims under the Tucker Act. 466 F.3d at 995–98. Similarly, *Fisher* recognized the money-mandating nature of a disability retirement pay claim and explained the standard of review based on "controlling precedents," but did not invoke the APA. *Fisher*, 402 F.3d at 1180 ("The cases are consistent that this review is conducted under a deferential standard of review, *essentially the standard under which administrative agency decisions are reviewed*" (emphasis added)).

[16] The Federal Circuit's predecessor, the Court of Claims, similarly borrowed "[APA]-type review" for other money-mandating claims. *Foote Mineral Co. v. United States*, 654 F.2d 81, 84–85 (Ct. Cl. 1981) (applying "[APA]-type review" to a refund claim brought pursuant to 43 U.S.C. § 1734(c) (1976), and citing a military pay case, *Sanders*, 594 F.2d 804). As to whether it makes sense to apply APA case law wholesale in such cases, Judge Wolski observed that the more recent "convention of restricting review to the administrative record seems to conflict with the express holding of the Federal Circuit that plaintiffs challenging Correction Board determinations are 'entitled' to supplement this record with additional evidence." *Brooks*, 65 Fed. Cl. at 150 n.22 (quoting *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983)); *see also Joslyn v. United States*, 110 Fed. Cl. 372, 388 (2013) ("Both the record and the de novo evidence are considered to determine whether the decision of the military disability evaluation board was supported by substantial evidence." (citing *Beckham*, 375 F.2d at 785)).

*Doyon v. United States*, 58 F.4th 1235, 1242 (Fed. Cir. 2023) (explaining, in a case involving the Board for Correction of Naval Records, that the Federal Circuit "review[s] a decision of the Court of Federal Claims granting or denying a motion for judgment on the administrative record without deference" (citations and quotations omitted)).[17]   The Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof under the applicable standard of review, based on the evidence in the administrative record. *Bannum*, 404 F.3d at 1356–57.

## IV.    JUSTICIABILITY

"[T]here is a significant difference between determining whether a federal court has 'jurisdiction of the subject matter' and determining whether a cause over which a court has subject matter jurisdiction is 'justiciable.'"  *Powell v. McCormack*, 395 U.S. 486, 512 (1969) (quoting *Baker v. Carr*, 369 U.S. 186, 198 (1962)).   Justiciability concerns "whether the claim presented and the relief sought are of the type which admit of judicial resolution."  *Id.* at 516–17 ("In deciding generally whether a claim is justiciable, a court must determine whether 'the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded.'" (quoting *Baker*, 369 U.S. at 198)).[18]

---

[17] *See also Young v. United States*, 497 F. App'x 53, 58–59 (Fed. Cir. 2012) (explaining that military pay claims and this Court's review of military correction board decisions may be decided via motions for judgment on the administrative record pursuant to RCFC 52.1, which "provides a procedure for parties to seek the equivalent of an expedited trial on a 'paper record, allowing fact-finding by the trial court'" (quoting *Bannum*, 404 F.3d at 1356)); *Acevedo v. United States*, 216 F. App'x 977, 979 (Fed. Cir. 2007) (explaining that this Court, in reviewing decisions of the Army Board for the Correction of Military Records, "is required to make factual findings under [RCFC] 52.1 from the record as if it were conducting a trial on the record" (footnote omitted) (citing *Bannum,* 404 F.3d at 1355–57)).

[18] The weight of the precedent dictates that we review questions of justiciability pursuant to RCFC 12(b)(6) (failure to state a claim) and not RCFC 12(b)(1) (lack of jurisdiction).   *Torres v. United States*, 650 F.2d 290 n.1 (Ct. Cl. 1980) (unpublished table case); *Target Training Int'l, Ltd. v. Extended Disc N. Am., Inc.*, 645 F. App'x 1018, 1022 n.1 (Fed. Cir. 2016); *Deshauteurs v. United States*, 39 Fed. Cl. 263, 270 n.9 (1997) ("Federal decisions governing dismissal of military pay claims on the basis of nonjusticiability are to a certain degree equivocal as to whether the dismissal is based on lack of jurisdiction. However, the Federal Circuit's predecessor, the United States Court of Claims, ruled that dismissal of a claim on the ground of nonjusticiability equated to a failure to state a claim upon which relief may be granted."); *cf. Miller v. United States*, 119 Fed. Cl. 717, 725 (2015) ("The inquiry into justiciability is generally thought to fall more under RCFC 12(b)(6) than under RCFC 12(b)(1), although this is the subject of some dispute.").   The United States Court of Appeals for the District of Columbia Circuit takes the same view, albeit in the context of APA (and not Tucker Act) claims. *Sierra Club v. Jackson*, 648 F.3d 848, 853–55 (D.C. Cir. 2011) (commenting that

Here, the government argues that "the Navy's personnel and assignment decisions are entitled to great deference" and that because "the regulation at issue expressly provides that cancellations of transfers to the Fleet Reserve are approved on a 'selective basis only,' . . . the regulation assigns the Navy broad authority to deny requests to cancel transfer to the Fleet Reserve." Def. MJAR at 27. Standing alone, that is neither a jurisdictional nor a justiciability argument; rather, it merely restates the uncontroversial proposition that this Court owes a great degree of deference to the military when reviewing claims involving its personnel decisions. The government further posits, however, that to the extent Mr. Winston contends "that the Navy erred in not reinstating him *because of his qualifications or because of staffing needs*," that claim "is non-justiciable, as the Court is [in] no position to second-guess military personnel decisions." *Id.* (emphasis added); *see* Def. Rep. at 5 (arguing that "the Navy has wide discretion to deny a Sailor's request to cancel a transfer to the Fleet Reserve; and for that reason, the Navy's decision to deny Mr. Winston's cancellation request is non-justiciable").

The sound premise of the government's argument is that the Navy's discretion is so broad that certain of its personnel decisions may not be attacked on substantive grounds. *Lewis*, 458 F.3d at 1376–77 ("We have confronted decisions by the military concerning officer retention and promotion in a variety of contexts. In general, we have said that the questions of the fitness of an officer to serve on active duty, and in what capacity the officer should serve, are not for the courts to decide.").[19] This Court has no quarrel with that general proposition of law, but as discussed *infra*, it does not render

---

"[t]he distinction between a claim that is not justiciable because relief cannot be granted upon it and a claim over which the court lacks subject matter jurisdiction is important" and agreeing that "Rule 12(b)(6) should govern"); *see also Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot.*, 550 F.3d 1121, 1128–29 (Fed. Cir. 2008) (discussing whether plaintiff's claim is "justiciable under the APA").

[19] Because "'decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments,' the substance of such decisions, like many other judgments committed to the discretion of government officials, is frequently beyond the institutional competence of courts to review." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002) (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)). On the other hand, "[i]f an individual has a 'clear cut legal entitlement' to a position, but subordinate officials in the government misinterpret the Constitution, statutes, or regulations, and improperly decline to recommend that individual for nomination or appointment, redress may be available in the courts." *Lewis*, 458 F.3d at 1377 (quoting *Smith*, 384 F.3d at 1294–95 (an action for money arises under the Military Pay Act when an individual has a "clear-cut legal entitlement" to a promotion)). "Thus, the courts can review promotion decisions for violations [of] the Constitution, statutes, or regulations." *Id.* at 1377 (footnotes omitted).

Mr. Winston's claims entirely unreviewable. Judge Dietz succinctly explained the justiciability issue lurking in military pay cases:

> "Justiciability is a particularly apt inquiry when one seeks review of military activities." [*Murphy v. United States*, 993 F.2d 871, 872 (Fed. Cir. 1993)]. This is because "judges are not given the task of running the Army." *Orloff v. Willoughby*, 345 U.S. 83, 93-94, 73 S.Ct. 534, 97 L.Ed. 842 (1953). "The merits of a service secretary's decision regarding military affairs are unquestionably beyond the competence of the judiciary to review." *Adkins*, 68 F.3d at 1322. Thus, courts have recognized that there are "thousands of . . . routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence of the court to wrestle with." *Voge v. United States*, 844 F.2d 776, 780 (Fed. Cir. 1988).
>
> "[A]lthough the *merits* of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular *procedure* followed in rendering a military decision may present a justiciable controversy." *Adkins*, 68 F.3d at 1323 (emphasis in original). Even in areas wholly within its discretion, the military "is nevertheless bound to follow its own procedural regulations if it chooses to implement some." *Murphy*, 993 F.2d at 873. Thus, a challenge to a procedural matter is within a court's competence because "[t]he court is not called upon to exercise any discretion reserved for the military, it merely determines whether the procedures were followed by applying the facts to the statutory or regulatory ground." *Id.*

*Johnson v. United States*, 157 Fed. Cl. 8, 16–17 (2021).

In sum, "[t]he fundamental question of justiciability we confront here is whether 'tests and standards' exist against which a court can measure the challenged action." *Lindsay*, 295 F.3d at 1257 (quoting *Voge*, 844 F.2d at 780). A military pay claim thus is justiciable if it is based on either alleged procedural violations, *Baude v. United States*, 955

F.3d 1290, 1298 (Fed. Cir. 2020),[20] or where a service secretary otherwise "voluntarily constrains his discretion by promulgating regulations and instructions for its exercise." *Groves v. United States*, 47 F.3d 1140, 1145 (Fed. Cir. 1995). In such a case, a service secretary limits his "otherwise plenary discretion . . . so that plaintiff is entitled to appropriate judicial review[.]" *Id.* (quoting *Borgford v. United States*, 208 Ct. Cl. 1040, 1041 (1976)); *see also Roth v. United States*, 378 F.3d 1371, 1386 (Fed. Cir. 2004) ("[A] normally nonjusticiable decision is not insulated from judicial review if it flows directly from the breach of a statute or regulation.").[21]

In contrast, where there are no specified procedures and no meaningful tests and standards constraining the military's decisions regarding its personnel, the military's discretion is plenary, and claims about its decisions are nonjusticiable. *Sierra Club*, 648 F.3d at 856 (explaining that a court must "consider the language and structure of the statute to determine whether the [agency] retained discretion in the statutory duty so as to render [its] decision unreviewable").[22]

---

[20] *See also Fisher*, 402 F.3d at 1177 ("Even when Congress has given the military discretion in conducting its affairs, the military is bound to follow its own procedural regulations should it choose to promulgate them.").

[21] *See also Roth*, 378 F.3d at 1386 (Fed. Cir. 2004) ("[I]n order for [a servicemember's] claim to the correction of his record to be justiciable, there must exist standards by which a court can review the military decisions at issue." (citing *Adkins*, 68 F.3d at 1323)); *Fisher*, 402 F.3d at 1177 (explaining that "a case presents a justiciable controversy" where there are "'tests and standards' against which the court [can] measure[] the military's conduct").

[22] Although binding case law requires this Court to apply the APA standard of review to military pay claims, *see* Section III, *supra*, the Tucker Act cannot be read to incorporate the entire APA wholesale. For APA claims, the justiciability analysis is predicated on statutory text:

> The judicial review provisions of the [APA], 5 U.S.C. §§ 701–06, establish a cause of action for parties adversely affected either by agency actions or by an agency's failure to act. *Heckler v. Chaney,* 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) . . . . However, the APA explicitly excludes from judicial review those agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a). The Supreme Court has specified at least two occasions in which that exclusion applies: "[I]n those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply," *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quotation marks and citations omitted), and when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Chaney,* 470 U.S. at 830, 105 S.Ct. 1649. Agency actions in these circumstances are unreviewable because "'the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion.'" *Sec'y of Labor v. Twentymile Coal Co.,* 456 F.3d 151,

In light of those principles, the broadest possible characterization of the government's justiciability argument fails because the government acknowledges that Mr. Winston's "argument [is] that the Navy still must follow its own regulations — here, MILPERSMAN 1830–040 — and that it failed to do so in denying Mr. Winston's November 2015 cancellation request[.]"  Def. Rep. at 4–5.  That is precisely the type of procedural claim that is ordinarily justiciable.[23]  *See* Def. MJAR at 11 ("Article 1830–040 of the MILPERSMAN prescribes the procedures to request transfer to the Fleet Reserve.").

Accordingly, this Court may evaluate whether the Navy complied with applicable regulations, particularly where, as here, they provide for a cancellation request and specify some, albeit limited, substantive considerations as part of that procedure.  Indeed, the government all but gives away the ballgame on this issue in replying that:  (1) "the Navy followed its regulations, which did not prohibit the Navy from inquiring about or considering a justification or other considerations"; and (2) "the BCNR considered [Mr. Winston's] contentions three times and, each time, provided him a thorough explanation why it disagreed."  Def. Rep. at 6.  The mere fact that the parties debate whether the Navy complied with its regulations demonstrates that the claim at issue is, broadly speaking, justiciable.

All of that said, the Court's conclusion on justiciability is somewhat of a pyrrhic victory for Mr. Winston.  Because ultimately — in applying the standard of review to the merits of Mr. Winston's claims — the government is correct that the Navy's discretion is nearly at its apex, and Mr. Winston has not carried his burden to demonstrate that the Navy's decision was arbitrary, capricious, or otherwise contrary to law.

---

156 (D.C. Cir. 2006) (quoting *Drake v. FAA,* 291 F.3d 59, 70 (D.C. Cir. 2002)).

*Sierra Club*, 648 F.3d at 855.

[23] "The military no less than any other organ of the government is bound by statute, and even when granted unfettered discretion by Congress the military must abide by its own procedural regulations should it choose to promulgate them."  *Lindsay*, 295 F.3d at 1258 (citing *Murphy,* 993 F.2d at 873).

## V.    DISCUSSION

### A. The BCNR's Conclusion That Mr. Winston's Request to Transfer to the Fleet Reserve Was Voluntary Is Supported by Substantial Evidence and Is Not Arbitrary, Capricious, or Otherwise Contrary to Law

For Mr. Winston to succeed on the merits of his amended complaint, he must establish that his transfer to the Fleet Reserve was involuntary. *Metz*, 466 F.3d at 998 ("[I]f a plaintiff cannot establish that he is currently on active duty, he must assert and ultimately establish that his separation was involuntary in order to fit within the scope of, and take advantage of, the money-mandating status of § 204, or else his claim falls for failure to state a claim upon which relief can be granted.").

There is a presumption of voluntariness when a servicemember tenders his resignation or otherwise requests a discharge from activity duty. *Carmichael v. United States*, 298 F.3d 1367, 1372 (Fed. Cir. 2002) ("A presumption of voluntariness generally exists where an employee tenders his resignation or retires; the plaintiff bears the burden of coming forward with evidence to demonstrate that his resignation or retirement was not voluntary."). In this case, there is no dispute that Mr. Winston asked to transfer to the Fleet Reserve. Am. Compl. ¶ 97; Pl. MJAR at 10; Def. MJAR at 14.[24] (Mr. Winston does not dispute that the voluntary discharge doctrine applies here.)

To rebut the presumption of voluntariness, a servicemember must prove that: "(1) he involuntarily accepted the terms of the government; (2) circumstances permitted no other alternative; and (3) said circumstances were the result of the government's coercive acts." *Carmichael*, 298 F.3d at 1372 (citing *Christie v. United States*, 518 F.2d 584, 587 (Ct. Cl. 1975), and explaining that "an otherwise voluntary discharge is rendered involuntary if, among other things, it is obtained under duress or coercion"). "Because this is not a disjunctive test, a plaintiff must establish all three elements for the exception [to the presumption of voluntariness] to apply." *Nickerson v. United States*, 35 Fed. Cl. 581, 586 (1996), *aff'd*, 113 F.3d 1255 (Fed. Cir. 1997). Furthermore, coercion is measured by an objective standard, not the individual's subjective perception. *Carmichael*, 298 F.3d at 1372. The government's wrongful conduct, such as a failure to adhere to its own

---

[24] "Members of the Navy who complete at least twenty years of active duty service may receive retainer pay — the equivalent of retirement pay — if they are transferred to the Fleet Reserve after requesting a transfer." *Matthews v. United States*, 2013 WL 1909989, at *4 (Fed. Cl. May 7, 2013) (citing 10 U.S.C. § 8330(b)), *aff'd*, 750 F.3d 1320 (Fed. Cir. 2014).

regulations, could constitute coercive action. *Id.*

As the BCNR reasonably concluded, AR 699, Mr. Winston's claim that his dismissal was involuntary has no merit. Indeed, even if this Court were applying a *de novo* standard of review, this Court would reach the same conclusion. First, Mr. Winston admits that he submitted his request for a transfer to the Fleet Reserve on his own accord, and with no government prompting. Am. Compl. at ¶ 68. Mr. Winston claims that the purpose of that request was in order "to get away from his supervisor" and that he later "planned to cancel his request." *Id.* Mr. Winston argues that "his request to retire was involuntary because . . . [MACS] Minotto bullied, threatened, and harassed him" and Mr. Winston "had no other reasonable option than to request to retire and then to request to cancel his retirement request." Pl. Resp. at 27–28. In essence, Mr. Winston claims that the only reason why he requested to be transferred to the Fleet Reserve was to extract himself from the command of an abusive supervisor, that requesting transfer to the Fleet Reserve was the only way to do so, and thus the request was involuntary.

This Court rejects Mr. Winston's contention. The facts contained in the administrative record do not point to Mr. Winston's allegedly abusive supervisor as the motivation for his transfer request, let alone the cause.

Mr. Winston alleges that the abuse that he suffered at the hands of MACS Minotto began in early 2015, when Mr. Winston arrived in Bahrain and placed under MACS Minotto's command. Pl. Resp. at 12. Mr. Winston's claimed incidents of abuse begin in early 2015, (*e.g.*, when MACS Minotto ordered Mr. Winston not to attend a mandatory training when he arrived in Bahrain, *id.* at 14), and continued through May 2015 (*e.g.*, the DoDEA campus incident, Am. Compl. at ¶¶ 50–59). But Mr. Winston was reassigned to a different unit as the Supply Lead Chief Petty Officer on or about September 16, 2015. AR 171, 603, 692. At that point, Mr. Winston presumably had been removed from the direct command of MACS Minotto. *See* Pl. Resp. at 18 ("After his reassignment to another unit, Mr. Winston requested to cancel his retirement request . . . .").

If Mr. Winston's request to transfer to the Fleet Reserve was indeed motivated by the exigency of an abusive supervisor, then his request to transfer must have occurred before his September 2015 unit reassignment which would otherwise have rendered the need to transfer moot.[25] Mr. Winston was unable to demonstrate, however, that he

---

[25] Mr. Winston's entire claim rests on the allegation that his request to transfer to the Fleet Reserve was motivated by his need to escape the abusive command of MACS Minotto, and that he

requested to transfer to the Fleet Reserve prior to September 2015. The record is silent on the date of his requested transfer. To prove that Mr. Winston's request for transfer to the Fleet Reserve was truly in order to escape the command of MACS Minotto, Mr. Winston had the burden to demonstrate the date of his transfer request to the BCNR and the Court — something that he failed to do. Absent this piece of information, the premise that Mr. Winston's request to transfer to the Fleet Reserve was related to alleged harassment by MACS Minotto is unsubstantiated.[26]

Even if the Court assumes that Mr. Winston's transfer request did indeed predate his September 2015 reassignment, the claim that his motivation for requesting the transfer was MACS Minotto's abuse is still suspect. If indeed his request to transfer to the Fleet Reserve was no longer necessary due to his reassignment, and that is why he requested to cancel his transfer request, why did he wait until December 9, 2015, to request to cancel his retirement request? AR 143. Once he was reassigned in September, he should have immediately requested to cancel his transfer request.

Furthermore, as the BCNR pointed out, AR 699, in 2015 when Mr. Winston made his request to transfer to the Fleet Reserve, he was nearly two years away from being eligible to enter the Fleet Reserve. A minimum of 20 years in active duty is required before transfer to the Fleet Reserve is possible, see 10 U.S.C § 8330(b), and for Mr. Winston, the 20 years would not have accrued until 2017. *See* AR 148–51 (Mr. Winston's "Official Fleet Reserve Orders" have March 31, 2017, as the date of his transfer to the Fleet Reserve.). This Court simply cannot square Mr. Winston's claim that his request to

---

requested to cancel the transfer request once he was no longer under the command of MACS Minotto due to his reassignment to another unit. Mr. Winston oddly does not clearly express this in his briefs but only implies it. Pl. MJAR at 20 ("Once Plaintiff could continue to serve in the Navy in a harassment and abuse free environment, Plaintiff requested to cancel his retirement request."); Pl. Resp. at 18 ("After his reassignment to another unit, Mr. Winston requested to cancel his retirement request . . .").

[26] When pressed on this issue at oral argument, counsel for Mr. Winston implied that even after the reassignment, Mr. Winston was still being harassed by MACS Minotto and therefore would have wanted the transfer to Fleet Reserve to "further get away from him." Tr. at 10:8–12 ("My understanding, Your Honor, is even though he was reassigned, [MACS] Minotto was still there, still harassing him. So that's why Mr. Winston still wanted to further get away from him . . . ."). However, this is inconsistent with Mr. Winston's implied claim that he canceled his request to transfer to the Fleet Reserve once he was reassigned and was no longer exposed to MACS Minotto's alleged abuse — a claim necessary for Mr. Winston to establish that his request to transfer to the Fleet Reserve and his subsequent request to cancel that request was related to his ill treatment by MACS Minotto.

transfer to the Fleet Reserve was involuntary with the fact that he would not be able to transfer for nearly two years. The claim that Mr. Winston felt so uncomfortable under the command of MACS Minotto to the point that his request to transfer was involuntary makes no sense if the request would not have solved Mr. Winston's immediate problem with MACS Minotto.

Moreover, Mr. Winston had alternatives to address his situation, other than to request a transfer to the Fleet Reserve. Mr. Winston could have submitted an equal opportunity complaint, an Inspector General complaint, an Article 1150 complaint, a Mast request,[27] a request for an internal reassignment, or he could have attempted to find an external reassignment. AR 699, 1050–51. This plethora of alternatives to requesting a transfer to the Fleet Reserve likely would have been known to Mr. Winston with his long experience in the Navy, and some were even discussed in a meeting that Mr. Winston had with a Navy Judge Advocate in June of 2015. AR 1050. As such, Mr. Winston's claim that his choice to request transfer to the Fleet Reserve was involuntary fails the *Christie* test. *Christie*, 518 F.2d at 587 (involuntary discharge may be recognized where "circumstances permitted no other alternative").

Lastly, even if Mr. Winston's claims of a hostile work environment are true — claims for which the BCNR reasonably found insufficient evidence, AR 696 — and Mr. Winston felt that he had no choice but to leave the Navy, that would not render his choice to leave involuntary. *Staats v. U.S. Postal Serv.*, 99 F.3d 1120, 1124 (Fed. Cir. 1996) ("As this court has explained, the fact that an employee is faced with an unpleasant situation or that his choice is limited to two unattractive options does not make the employee's decision any less voluntary." (citing *Covington v. Dep't of Health & Hum. Servs.*, 750 F.2d 937, 942 (Fed. Cir. 1984))); *Norris v. United States*, 39 Fed. Cl. 807, 811 (1998) ("[Plaintiff] does not assert that he was forced to sign the request for retirement; he signed it voluntarily. The alternative may not have been desirable, but duress does not exist merely because of an undesirable alternative."). As the Federal Circuit has explained, "[t]o adopt a different rule would enable an employee to defeat lawful agency action, such as a geographical transfer, by resigning in protest, appealing on the ground that the resignation was rendered involuntary by the hardship imposed by the transfer, and

---

[27] https://www.mcrdsd.marines.mil/Portals/3/Documents/MISC-DOCS/Inspector_General/Request_Mast.pdf [https://perma.cc/BN7T-X2GK] ("Request Mast provides a member the opportunity to communicate not only with his or her immediate commanding officer, but also with any superior commander in the chain of command up to and including the member's immediate commanding officer.").

obtaining reinstatement (presumably with an immunity from the transfer) if the Board concluded that the employee retired unwillingly." *Staats*, 99 F.3d at 1124.

For these reasons, this Court concludes that Mr. Winston has not met his burden of proof to establish that his request to transfer to the Fleet Reserve was involuntary, and, therefore, he is not entitled to relief. The Court finds that the BCNR's decision on this issue was not arbitrary, capricious, or otherwise contrary to law.

### B. Mr. Winston Failed to Demonstrate that the Navy Improperly Rejected his Retirement Cancellation Request or that the BCNR's Decision Is Arbitrary, Capricious, or Otherwise Contrary to Law

On December 9, 2015, Mr. Winston requested to cancel his transfer to the Fleet Reserve. AR 143. The form through which Mr. Winston communicated this request was NAVPERS 1306/7 (Enlisted Personnel Action Request), and contained a section with the heading "Reason for Submission." AR 143, 693. In that section, Mr. Winston inserted the following note: "Respectfully request to cancel my Fleet Reserve. I will not reach [high year tenure] until April 2021." *Id*. The request was denied; the AR does not contain the exact date of the denial. Def. MJAR at 15 n.7. (Notably, Mr. Winston did not request cancellation on the basis — contrary to what he now asserts — that the entire request to transfer to the Fleet Reserve was a ploy to avoid an allegedly difficult commanding officer.)

On March 24, 2016, Mr. Winston sent a memorandum to his commanding officer regarding his request to cancel his transfer to the Fleet Reserve. AR 145, 988. He noted the following: "MILPERS disapproved my 1306 submitted in November 2015 to cancel transfer to Fleet Reserve due to 'No justification provided for can[cel].' I'm resubmitting the enclosed revised 1306 with justification." *Id*.[28] The memorandum is dated March 24, 2016. *Id*. The AR does not contain the resubmitted Form 1306 that Mr. Winston referenced. Def. MJAR at 15 n.8; AR 27 (Advisory Opinion noting the absence of the document with the petition).

---

[28] The Court notes that according to this memorandum, Mr. Winston submitted his first cancellation request in "November 2015." However, the date on the actual cancellation request form NAVPERS 1306/7 contained in the AR is December 9, 2015. AR 143. The Court assumes that the correct date is the one reflected on the form and that Mr. Winston was mistaken when he recalled the date in his memorandum. Neither Mr. Winston nor the government addressed this discrepancy.

The record is silent on the reason that Mr. Winston's request was denied. Mr. Winston asserts that the Navy improperly imposed a *per se* rule insofar as the "Navy disapproved the cancellation" because he did not provide a justification for the requested cancellation. Pl. Resp. at 18. Mr. Winston argues that requiring a justification itself constituted a violation of MILPERSMAN 1830–040 because the regulations do not require that a servicemember requesting cancellation of a request to transfer to the Fleet Reserve provide a justification for the request. *Id.* at 28 ("[I]n this case, the Navy added a requirement that was not found in MILPERSMAN 1830–040 . . . namely that a justification was needed."). Therefore, Mr. Winston contends, "the Navy acted capriciously, arbitrarily, and contrary to law when it denied Mr. Winston's November 2015 cancellation request because it needed a justification — where MILPERSMAN 1830–040 did not require one." *Id.* at 28–29.

The Court finds that the Navy did not err in denying Mr. Winston's request to cancel his transfer to the Fleet Reserve.

MILPERSMAN 1910–166 ¶ (1) provides as follows:

> Congress has granted authority to the Secretary of the Navy (SECNAV) to approve requests to transfer those enlisted personnel who complete 20 years of creditable active duty service to the Fleet Reserve. The discretion of SECNAV to approve such transfers is absolute.

MILPERSMAN 1910–166 ¶ (1).

MILPERSMAN 1830–040 ¶ (7)(a) provides details for how a transfer cancellation request will be considered:

> Due to the many administrative and planning actions involved on behalf of member and command, a request for deferral or cancellation of a Fleet Reserve transfer Authorization will be granted on a selective basis only. A number of factors including command recommendation, past performance, manning levels, availability of relief, end-strength, effect on promotions, and critical skills possessed by member, will all be considered.

MILPERSMAN 1830–040 ¶ (7)(a).[29]

Mr. Winston has the burden of proving that the Navy did not act in accordance with its regulations and did not consider the relevant factors listed above. He has not come close to meeting that burden. All that Mr. Winston has pointed to in the record is his own assertion that the Navy disapproved his request solely due to his not providing a justification for the cancellation. *See* AR 988.

Even if this Court accepts Mr. Winston's claim that the Navy relied on Mr. Winston's failure to provide a justification for his cancellation request, that would neither violate regulations nor would it be unreasonable. Although (as Mr. Winston correctly asserts) the regulations do not require a justification, they do not preclude the Navy from seeking a justification or considering whether one was provided. Nor, for that matter, is there anything irrational in the Navy's seeking a justification — or considering the lack of one — to aid the Navy in its calculus to either grant or deny a cancellation request.

The NAVPERS 1306/7 form used by servicemembers to request such cancellation actually contains a space labeled "Reason for Submission," and allows remarks of up to 250 characters. AR 143. That is yet a further indication that failing to provide any justification for a cancellation request may be considered by the Navy in determining whether or not to grant or deny such requests. At a minimum, Mr. Winston cannot claim any unfairness where he was on notice that the Navy sought his reasons for the cancellation request. In that regard, the Navy's internal regulations make clear that the grant of a cancellation is atypical, rather than an entitlement, as MILPERSMAN 1830–040 provides that the "cancellation of a Fleet Reserve transfer Authorization will be granted on a *selective basis only*." MILPERSMAN 1830–040 ¶ (7)(a) (emphasis added). Thus, the Navy's requiring Mr. Winston to provide justification for his cancellation request is only natural, considering that such requests are not usually granted.

---

[29] The government asserts that above-cited language from the version of the MILPERSMAN in effect during the course of the events at issue applies here. Def. MJAR at 11 n.1. This appears to the Court to be the case, and Mr. Winston has not disputed the government's assertion. In any event, more recent versions of MILPERSMAN 1830–040 ¶ (7)(a) contain only slightly different language in ¶ (6)(a).
*See e.g.,* https://www.mynavyhr.navy.mil/Portals/55/Reference/MILPERSMAN/1000/1800R etirement/1830-040.pdf?ver=SIJ38a5AelrMJ1y61YD96w%3d%3d [https://perma.cc/98Z9-DSQW].

Finally, a presumption of regularity applies to the Navy's decision here. Mr. Winston has not provided evidence to rebut that presumption. *See Richey v. United States*, 322 F.3d 1317, 1326 (Fed. Cir. 2003) (noting that the record did not "contain evidence to overcome the presumption of regularity that attaches to all administrative decisions"); *Impresa Construzioni*, 238 F.3d at 1337–38 ("Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious. . . . The litigant challenging that presumption necessarily bears a heavy burden."). Particularly given the plenary authority the Navy has to deny a Fleet Reserve cancelation request, the Court presumes that the Navy properly considered Mr. Winston's request to cancel his transfer to the Fleet Reserve, pursuant to the applicable MILPERSMAN provision.

### C. The Relief that Mr. Winston Requests Cannot Be Granted

In the alternative, the relief for which Mr. Winston petitions this Court is beyond the province of this Court to grant. Mr. Winston requests *inter alia* that "Mr. Winston's military records be corrected to show that he was not discharged on March 31, 2017[,] but continued to serve without interruption on active duty." Am. Compl. at 15.

Mr. Winston's enlistment contract expired on March 27, 2017. AR 588. Mr. Winston's transfer to the Fleet Reserve occurred on March 31, 2017. AR 150. Thus, Mr. Winston is not asking this Court to decide that he would not have been discharged, but rather that the Navy would have permitted Mr. Winston to reenlist absent his transfer to the Fleet Reserve. That is a decision that is beyond the power of this Court. *Dodson v. United States Gov't, Dep't of Army*, 988 F.2d 1199, 1208 (Fed. Cir. 1993) ("Because no one has a right to enlist or reenlist in the armed forces unless specially granted one, an enlisted serviceman who has been improperly discharged is entitled to recover pay and allowances only to the date on which his term of enlistment would otherwise have expired had he not been so discharged."); *Maier v. Orr*, 754 F.2d 973, 983 (Fed. Cir. 1985) ("Federal courts have uniformly declined to order promotions . . . and to order relief beyond a current enlistment . . . ."); *Harper v. United States*, 104 Fed. Cl. 287, 293 (2012) ("The Court of Federal Claims lacks the authority to order reinstatement after a servicemember's enlistment term has expired.").

Accordingly, this Court lacks the authority to force the Navy to reenlist Mr. Winston or to have his records corrected to show the same.

## VI.    CONCLUSION

For the foregoing reasons, Mr. Winston's motion for judgment on the administrative record is hereby **DENIED** and the government's cross-motion for judgment on the administrative record is **GRANTED**.  The Clerk of the Court is directed to enter **JUDGMENT** for the government, dismissing this case.

**IT IS SO ORDERED**.

<u>s/Matthew H. Solomson</u>
Matthew H. Solomson
Chief Judge